**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| ANDREW W. RAYMOND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO.: _____ |
| vs. | ) | |
| | ) | |
| UNLIMITED TAXES & MORE | ) | Jury Trial Demanded |
| FRANCHISING COMPANY, LLC, | ) | |
| UNLIMITED TAXES & MORE, | ) | |
| INC., | ) | |
| UNLIMITED TAXES & MORE | ) | |
| LICENSING COMPANY, LLC., | ) | |
| UNLIMITED TAXES & MORE TAX | ) | |
| TRAINING RESOURCE CENTER, | ) | |
| LLC, and SHONDA MICHELE | ) | |
| MICKEL, | ) | |
| | | |
| Defendants. | | |

## VERIFIED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

COMES NOW, Plaintiff Andrew W. Raymond, by and through undersigned counsel, and files this Verified Complaint for Damages and Equitable Relief against Defendants Unlimited Taxes & More Franchising Company, LLC, Unlimited Taxes & More, Inc., Unlimited Taxes & More Licensing Company, LLC., Unlimited Taxes & More Tax Training Resource Center, LLC, and Shonda Michele Mickel, and shows the Court as follows:

1

## PARTIES

This Court has jurisdiction over one or more causes of action under 28 U.S.C. § 1332. The matter in controversy is between citizens of different States.

1.

Plaintiff Andrew W. Raymond ("Franchisee" or "Raymond") is a citizen of the State of Texas.

2.

Defendant Unlimited Taxes & More Franchising Company, LLC ("UT&M Franchising"), a Georgia limited liability company, has its principal place of business in the State of Georgia at 241-C West General Screven Way, Hinesville, GA 31313, and may be served with process by delivering a copy of the Summons and Complaint to its registered agent, Shonda Mickel, who is located at 804 Jay Street, Hinesville, Georgia 31313.

3.

Defendant Unlimited Taxes & More, Inc. ("UT&M Corp"), a Georgia corporation, has its principal place of business in the State of Georgia at 241-C West General Screven Way, Hinesville, GA 31313, and may be served with process by delivering a copy of the Summons and Complaint to its registered agent, Shonda Mickel, who is located at 804 Jay Street, Hinesville, Georgia 31313.

4.

Defendant Unlimited Taxes & More Licensing Company, LLC. ("UT&M Licensing"), a Georgia limited liability company, has its principal place of business in the State of Georgia at 241-C West General Screven Way, Hinesville, GA 31313, and may be served with process by delivering a copy of the Summons and Complaint to its registered agent, Shonda Mickel, who is located at 804 Jay Street, Hinesville, Georgia 31313.

5.

Unlimited Taxes & More Tax Training Resource Center, LLC ("UT&M Training"), a Georgia limited liability company, has its principal place of business in the State of Georgia at 241-C West General Screven Way, Hinesville, GA 31313, and may be served with process by delivering a copy of the Summons and Complaint to its registered agent, Shonda Mickel, who is located at 804 Jay Street, Hinesville, Georgia 31313.

6.

Defendant Shonda M. Mickel ("Mickel") is a natural person, a citizen of the State of Georgia, and may be served with process by delivering a copy of the Summons and Complaint to her at her principal residence 804 Jay Street, Hinesville, Georgia 31313, at her principal place of business at 241-C West General Screven Way, Hinesville, GA 31313, or any other place where she may be found.

7.

UT&M Franchising, UT&M Corp, UT&M Licensing, UT&M Training are affiliates of Mickel because they are directly controlled by, and under common control of Mickel (UT&M Franchising, UT&M Corp, UT&M Licensing, UT&M Training, and Mickel being sometimes hereinafter referred to collectively as the "Affiliates" or "UT&M" and singly as an "Affiliate").

## **JURISDICTION**

8.

The matter in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. § 1332.

9.

One or more causes of action in this action arises under a federal statute, including 18 U.S.C. 1343, 18 U.S.C. § 1961-1968, and 18 U.S.C. § 1964, et seq.

10.

Each Defendant breached a contract with Plaintiff in Georgia, through acts and omissions inside and outside Georgia, contacted Raymond by telephone, text, and email before and after Raymond executed the aforementioned contract for the sake of soliciting the same, and transacted business in the state of Georgia. Jurisdiction is appropriate against each Defendant in this Court.

11.

Each Defendant caused a tortious injury to Plaintiff in Georgia, through acts and omissions inside and outside Georgia both before and after Raymond executed the aforementioned contract for the sake of soliciting the same. Jurisdiction is appropriate against each Defendant in this Court.

## VENUE

12.

Venue is appropriate in this Court as Defendants conduct business and regularly solicit business in this venue.

## SUMMARY

13.

Shonda Mickel is a 51-year-old convicted felon. For years, she has engaged in the illegal sale of UT&M Taxes & More™ tax preparation franchises by ignoring the federal disclosure requirements promulgated by the U.S. Federal Trade Commission (the "FTC") that are intended to reduce fraud in the sale of franchises. Previously, Raymond, a 23-year-old, UT&M Taxes & More™ franchisee, filed suit against Defendants alleging that Mickel who, directly and indirectly through one or more of her Affiliates, had, unlawfully forced him out of business. Specifically, Mickel had illegally (i) poached Raymond's tax preparers, (ii) denied Raymond

access to both the bank account and the Transaction Reports that recorded all of Raymond's business activity (including client lists, tax refunds due clients from federal and state tax authorities, royalty and other miscellaneous fees due Defendants, compensation due Raymond's tax preparers, and gross profits due Raymond), (iii) disabled the franchisee's tax preparation software, (v) terminated Raymond's sublease at the location where the franchisee conducted business, (vi) withheld Raymond's earned income, and (vii) blocked Raymond from determining the franchisee's accounts payable and work in process.

14.

No doubt fearful that the FTC would learn of her illegal franchise operations, Mickel fraudulently induced Raymond to enter into a Settlement Agreement and Release (the "Settlement Agreement) within a week after Raymond filed suit. The Settlement Agreement was predicated on  an undisclosed side deal proposed by Raymond, assuring Raymond that, ***once the case was dismissed***, she would *"**provide [Raymond] with all copies**"* of the Transaction Reports, *"**go over all deposits**"* and pay Raymond any additional compensation due him while assuring him in writing, *"**I'm not a thief**."* Mickel repeated these assurances after the Settlement Agreement was signed; however, since those last assurances, Raymond has been unable to reach Mickel and she has not proffered the promised Transaction Reports.

15.

In this lawsuit, Raymond seeks a judgment against Defendants and to recover all damages permitted under Georgia law based on the following theories: (i) Breach of contract described in numbered paragraphs 48 through 53; (ii) negligent misrepresentation (in the alternative to breach of contract); (iii) constructive fraud; (iv) negligence per se and tortious misconduct; (v) civil conspiracy; (vi) Georgia RICO; (vii) Federal Rico; (viii) conversion; (ix) and unjust enrichment. In addition, Raymond seeks the imposition of an equitable lien and constructive trust, and an accounting.

## **BACKGROUND**

**A.    Failure to Deliver FTC Disclosure Document**

16.

Defendants are in the business of selling a proprietary system for the operation of businesses that offer tax preparation services under the registered trademark, "UT&M Taxes & More Inc.®" and the unregistered trademark, "UT&M Taxes and More." UT&M Licensing applied for its registered trademark, "UT&M Taxes & More Inc.®," in 2013.

17.

Because of widespread deception in the sale of franchises and business opportunities, the "FTC regulates the sale of franchises under an FTC rule entitled

"Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" (the "FTC Franchise Rule"). *See* 16 CFR Parts 436 and 437.

18.

Under the FTC Franchise Rule, a commercial business arrangement is a "franchise" if it satisfies three definitional elements; specifically, the franchisor must: (1) promise to provide a trademark or other commercial symbol; (2) promise to exercise significant control or provide significant assistance in the operation of the business; and (3) require a minimum payment of at least $500 during the first six months of operations. *See* https://www.ftc.gov/legal-library/browse/rules/franchise-rule.

19.

Defendants meet the definition of a franchise under the Franchise Rule.

20.

The FTC Franchise Rule requires franchisors to provide all potential franchisees with a disclosure document containing 23 specific items of material information about the offered franchise, its officers, and other franchisees, to enable the potential franchisees to weigh the risks and benefits of such an investment. *See* 16 CFR Parts 436 and 437.

21.

Neither Mickel nor her Affiliates delivered to Raymond the required

disclosure document and thereby violated the FTC Franchise Rule.

22.

Defendants intentionally failed to deliver the FTC disclosure statement because they knew Raymond's review of the FTC disclosure statement would include material information of a negative nature about UT&M Franchising and its affiliates that would dissuade Raymond from purchasing the Franchise.

23.

Defendants refrained from delivering the FTC disclosure statement from Raymond with the intent to induce Plaintiff to act to his detriment by purchasing the Franchise.

B.      Franchise and Ancillary Agreements

24.

Raymond signed a Franchise Agreement with UT&M Franchising on October 25, 2021, for a five-plus year term ending on December 31, 2026. Under the Franchise Agreement, Raymond acquired the right to operate a tax preparation service in Ft. Worth, Texas using UT&M Franchising's trademarks, systems, and procedures (the "Franchise").

25.

Contemporaneously with his execution of the Franchise Agreement, Raymond also signed a Software License Agreement with UT&M Franchising and

an Affiliate Software License Agreement with UT&M Corp (the "Agreements"). UT&M Franchising and UT&M Corp are hereinafter referred to collectively as "UT&M."

26.

The Franchise operated from a storefront located at 6730 Brentwood Stair Road, Fort Worth, Texas 76112 (the "Storefront"). UT&M leased the Storefront and subleased it to Raymond for a yearly nonrefundable renewal fee of $10,000.

27.

According to the Agreements, Raymond had no obligation to pay the renewal fee during the first year of the Franchise's operation; however, UT&M breached the Agreements by demanding that Raymond pay the $10,000 renewal fee in January 2022, after less than three months of operation, instead of October 25, 2022.

## C.    Royalty and Transaction Fees; Financial Reports; Payment Process

28.

The Franchise Agreement required that Raymond pay UT&M a continuing royalty, payable weekly, equal to 30% of all net revenue derived from the sale of goods and services provided by the Franchise (the "Royalty Fees").

29.

In addition to the Royalty Fees, UT&M was entitled to the payment of

transaction fees. The Agreements required that the Franchise charge each of its clients transaction fees of between $617.00 and $672.00 (collectively, the "Transaction Fees").

30.

Under the Agreements, all revenue produced by the Franchisee was automatically deposited into a bank account that UT&M controlled and had unfettered discretion.

31.

UT&M required the Franchise to input data into a software program to which UT&M had complete access.  The software program detailed the following:

(i)     Each client serviced by the Franchise.

(ii)    The transaction Fees paid by each of the Franchisee's clients.

(iii)   The date the Franchisee filed federal and state tax returns for each client.

(iv)   The expected tax refund due for each client after deducting the transaction fees, royalty payment, other tax preparation charges, and the amount payable to the Franchisee.

(v)    The date the Internal Revenue Service and/or any state tax authority deposited each client's tax refund into the bank account controlled by UT&M.

(vi)    The amount of the Royalty due and payable to UT&M from each client's tax refund.

(vii)    The balance due to the Franchisee from each client for services rendered by the Franchisee, including services performed by the Franchisee's affiliates.

(viii)   The remaining balance due to the Client.

32.

UT&M had complete control over when and if the Franchisee or its affiliates were paid for services rendered to the Franchisee's clients.

## D.   Tax Returns Processed and Payments Received or Due and Payable

33.

From October 25, 2021, through March 14, 2022, the Franchisee prepared federal and state tax returns for 198 clients who have already received tax refunds. UT&M received $313,516.40 in revenue attributable to these 198 clients.

34.

In addition, as of March 15, 2022, the Franchisee had prepared federal and state tax returns for over 500 additional clients who had not yet received tax refunds. On information and belief, UT&M was to receive approximately $791,700.00 in additional revenue attributable to those over 500 clients.

E.    **Affiliate Network**

35.

In addition to the revenue generated by the Storefront, Raymond also developed an affiliate network consisting of independent contractors that he engaged as tax preparers.

36.

Raymond's affiliate network included his mother, Kayla Brown, Monica Brown, Erica Nelson, Christian Cardoso, Kierra Dickerson, Jahnell Easly, Kimberly Edwards, Laquita Edwards, Karen Neal, Laquan Skinner, Jasmeika Simons, and Kijandria Veal.

37.

These members of the affiliate network, as of March 15, 2022, had prepared approximately 960 tax returns. These tax return preparation services alone generated tax preparation fees to UT&M of approximately $100,000, and royalties to UT&M of approximately $60,000, with the balance of approximately $130,000 to have been split between Raymond and these affiliates. On information and belief, UT&M circumvented Raymond by paying certain of these affiliates directly, thereby cutting Raymond out of the loop.

43.

In direct competition with Raymond, and without terminating the Franchise,

UT&M recruited three of Raymond's affiliates, namely Laquinta Edwards, Erica Nelson, and Kierra Dickerson, to work directly for UT&M to the detriment of Raymond.

**F.    Failure to Deliver Transaction Reports, Forfeiture of Fees, Withholding Additional Fees, and Denying Access to Bank Account**

38.

On March 16, 2022, Raymond received a text message from Defendant Mickel stating that "You're very immature!!! Your fees are forfeited. Please don't contact me again – your attorney can correspond with my attorney."

39.

Shortly thereafter, Unlimited instructed the bank to *withhold* further payments to Raymond and deny Raymond access to the bank account.

40.

UT&M also cut Raymond off from receiving any further Transaction Reports, including those that would have reflected the tax preparation fees payable to Raymond on March 30, 2022, April 7, 2022, and April 14, 2022.  As described previously, the exact amount of fees is not ascertainable at this time because Defendants have denied Raymond access to the Transaction Reports that provide the data required to determine the same.

## G.    Deactivation of Tax Preparation Software

41.

In mid-March 2022, without any notice of termination, UT&M arbitrarily deactivated the tax preparation software that Raymond licensed from UT&M. As a result, Raymond was unable to provide tax preparation services to new clients. Defendants' deactivation of the tax preparation software constituted another breach of contract.

## H.    Wrongful Termination of Sublease

42.

As noted previously, UT&M Franchising leased the Storefront and sublease it to Raymond for a yearly nonrefundable renewal fee of $10,000. The annual renewal fee was due and payable on December 31, 2022, under the plain meaning of the Agreement. Defendants, however, breached the Franchise Agreement by improperly demanding that Raymond pay annual renewal fee in January 2022, or face eviction. Because of Defendants' superior bargaining power, Raymond was forced to pay the annual renewal fee 12 months before it was actually due.

43.

In mid-March 2022, the Storefront's owner showed Raymond a letter from Defendants advising the owner that Raymond was vacating the premises on April 30, 2022. Until then, Raymond had no idea that Defendants were attempting to force

him off the premises.  Raymond was forced to vacate the premises on April 30, 2022.

Defendants' actions in forcing Raymond's departure from the premises also

constituted a breach of contract.

## I.    Raymond Did Not Receive any Notice of Default

### 44.

Until the Settlement Agreement was signed, the Agreements were in full

force and effect.  Raymond never received any notice of default under the

Agreements.

## FACTS

## A.    Settlement Agreement

### 45.

On May 18, 2022, merely eight days after Raymond filed the lawsuit against

Defendants for breach of the Franchise Agreement, the License Agreement, and

other ancillary agreements, Mickel and her Affiliates entered into the Settlement

Agreement with Raymond.

### 46.

On information and belief, Mickel wanted to shut down the lawsuit quickly to

reduce the Defendants' financial exposure.

### 47.

On information and belief, Mickel also wanted to reduce the likelihood the

FTC would learn of her illegal franchise operations and initiate an investigation leading to an FTC enforcement action.

**B.    Undisclosed Criminal Record**

48.

On information and belief, Mickel also wanted to avoid an examination of her undisclosed criminal record.

49.

In 1995, when she was age 24, Mickel was arrested and charged with (i) Fraudulent Use of Credit Cards under 18 U.S.C. §§ 1029(a)(2) and (b)(1), (ii) Conspiracy under 18 U.S.C. § 371, and (iii) Aiding and Abetting under 18 U.S.C. § 2. See *USA v. Mickel*, U.S. District Court for the Southern District of Georgia, Savannah Division, Case No. 4:95-cr-00147-BAE.

50.

After pleading guilty to reduced charges, Mickel served a 90-day sentence in the Chatham County Correctional Center, was placed on probation for a period of five years and was ordered to perform 300 hours of community service, submit to testing and treatment for drug abuse, and pay a $1,000 fine. See *USA v. Mickel, supra*, at Docket 44. A year later, Mickel was arrested for violation the terms of probation, remanded to custody, and committed to 24 months in the federal Bureau of Prisons for shoplifting and participating in a fraudulent scheme to defraud

Walmart. See *USA v. Mickel,* supra, at Docket 52; https://ecf.gasd.uscourts.gov/cgi-bin/DktRpt.pl?147930968762072-L_1_0-1.

## C.    Experienced Litigant; New Contract; Side Deal

51.

In addition to being a convicted felon and a serial violator of federal franchise law, Mickel is an experienced litigant. She has been a plaintiff in several civil lawsuits and is familiar with the lawsuit settlement process.

52.

On May 15, 2022, Mickel entered into a new contract with Raymond, memorialized in part through text messages, in which she conditioned further payments to Raymond on the prior execution of the Settlement Agreement (the "Side Deal").

53.

Mickel assured Raymond in the text messages that, ***once the case was dismissed***, she would ***"provide [Raymond] with all copies"*** of the Transaction Reports, ***"go over all deposits"*** and pay Raymond any additional compensation due him.

54.

***"I'm not a thief***,*"* she wrote to Raymond. But in fact, Mickel was convicted

of theft.

55.

Mickel cautioned Raymond to keep the side deal secret because it would derail the settlement negotiations, but, on information and belief, her true motivation was to keep Raymond from obtaining the Transaction Reports through discovery and learning the extent to which Mickel and her Affiliates had cheated him.

56.

On information and belief, Mickel entered into the Side Deal in bad faith, believing that the integration/merger clause in the Settlement Agreement would render unenforceable any prior agreements that Raymond and she made before the Settlement Agreement was signed, including the Side Deal.

57.

However, after Raymond signed the Settlement Agreement, Mickel communicated with him again, reassuring him again that, once the case was dismissed with prejudice, she would provide Raymond with all copies of the Transaction Reports, go over all deposits, and pay Raymond any additional compensation due him. However, since that time, Raymond has been unable to reach Mickel and she has not proffered the promised Transaction Reports.

58.

At a minimum, the Settlement Agreement does not constitute a promise not

to sue for the commission of torts and breach of contracts that occur after execution of the Settlement Agreement.

## C.    Wire Fraud

59.

Before and after both the Settlement Agreement and the Side Deal were consummated, Defendants engaged in a systematic and ongoing scheme with the intent to defraud, deceive, and mislead Raymond . Defendants knowingly devised or knowingly participated in a scheme or artifice to defraud Raymond and obtain the money or property of Raymond by means of fraudulent pretenses, representations, or promises in violation of 18 U.S.C. § 1843.

60.

Defendants' business practices described above are contrary to public policy or fail to measure up to the reflection of moral uprightness, fundamental honesty, fair play and right dealing in the general and business life of members of society in violation of 18 U.S.C. § 1843.

61.

Defendants could foresee that the Mickel wires would be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, or carrying out the scheme, within the meaning of 18 U.S.C. § 1843.

62.

In particular, Defendants knew or could foresee that the Mickel wires would be used to transmit false and deceptive descriptions of the Defendants' franchise opportunity on the websites of one or more of the Affiliates and, after the Settlement Agreement was signed, further deceive Raymond.

63.

Mickel acting singly and in concert, personally or through UT&M (or their agents), used the Mickel wires or caused the Mickel wires to be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, or carrying out a scheme to defraud Raymond, within the meaning of 18 U.S.C. § 1843.

64.

It is not possible for Raymond to plead with particularity all instances of wire fraud that advanced, furthered, executed and concealed the scheme because the particulars of many such communications are within the exclusive control and within the exclusive knowledge of UT&M.

65.

All of the wire communications described above crossed Mickel and international borders by reason of the technology used to transmit the communications.

66.

Some or all of the communications described above have appeared and continue to appear on the websites or email servers of one or more of the Affiliates since the date of their original posting.

67.

Each and every use of the Mickel wires described above was committed by Defendants with the specific intent to defraud Raymond by means of false or fraudulent pretenses, representations or promises. Defendants' acts of wire fraud in violation of 18 U.S.C. § 1343 constitute racketeering activity as defined by 18 U.S.C. § 1961(1)(B).

68.

Raymond justifiably relied on Defendants' fraudulent representations and omissions made pursuant to the above-described scheme, resulting in a loss of revenue to Raymond and Raymond's entitlement to money damages.

## CLAIMS FOR RELIEF

### COUNT I

### *BREACH OF CONTRACT – IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING*

69.

Plaintiff Andrew Raymond realleges and herein incorporates by reference the allegations contained in paragraphs 1 through 68 above.

70.

Implied in every contract are duties of good faith and fair dealing. These common law implied duties require that parties to a contract exercise good faith and honest judgment in carrying out their rights and obligations under the contract and refrain from acting arbitrarily or capriciously or with an improper motive. "The requirement that a party exercise good faith and honest judgment, even where the contractual language grants the party discretion, arises from the implied duty of good faith and fair dealing imposed upon virtually every contract under Georgia law." *Capital Health Management Group, Inc. v. Hartley*, 301 Ga. App. 812, 817 (2009). "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts Sec. 205.

71.

Defendants had a duty of good faith and fair dealing in negotiating both the Settlement Agreement and the Side Deal. Instead, Defendants were dishonest and opportunistic. In inducing Raymond to sign the Settlement Agreement, Defendants exploited Raymond's inexperience by convincing him that the Side Deal would resolve his concerns, even though Mickel had no intention of honoring the Side Deal and believed that the merger/integration clause would absolve her and her Affiliates of further liability. "The office of the doctrine of good faith is to forbid the kinds of opportunistic behavior that a mutually dependent, cooperative relationship might enable in the absence of rule." *Market Street Associates Limited Partnership v. Frey*,

941 F.2d 588 (7th Cir. 1991).

72.

Because of the Defendants' breach of the implied covenant of good faith and fair dealing, Raymond has suffered damages, and is entitled to relief in the form of actual damages in an amount of approximately $400,000.00 or such amount as shall be determined at trial.

73.

Raymond is entitled to attorneys' fees and expenses of litigation because both the Settlement Agreement and the Side Deal were entered into in bad faith and procured by fraud.

## COUNT II

### *BREACH OF CONTRACT – VIOLATION OF EXPRESS WARRANTIES*

74.

Plaintiff Andrew Raymond realleges and herein incorporates by reference the allegations contained in paragraphs 1 through 73 above.

75.

The Side Deal was a valid binding contract between Raymond and Mickel.

76.

Mickel breached the Side Deal by failing to use reasonable efforts to fulfill her obligations under the Side Deal.

In addition, Mickel breached several express warranties that it made in the Side Deal, including, without limitation, delivering to Raymond the Transaction Reports, going over all deposits, and paying Raymond.

77.

Because of Mickel's breach of the express warranties, Raymond has suffered damages, and is entitled to relief in the form of actual damages in an amount of approximately $400,000.00 or such amount as shall be determined at trial.

78.

Raymond is entitled to attorneys' fees and expenses of litigation because the Sales Contracts were entered into in bad faith and procured by fraud.

**COUNT III**

***NEGLIGENT MISREPRESENTATION***

79.

Plaintiff Andrew Raymond realleges and herein incorporates by reference the allegations contained in paragraphs 1 through 78 above.

80.

Mickel, individually, and by and through her Affiliates, had a duty to Raymond to speak the truth and to cause the truth to be spoken, when representations were made to Plaintiff which were material to Plaintiff's decision to sign the

25

Settlement Agreement and agree to the Side Deal.

81.

Mickel, individually, and by and through her Affiliates, breached that duty and negligently made misrepresentations and/or omissions of material facts to Plaintiff. Plaintiff was a foreseeable party, who reasonably relied on the misrepresentations made by Defendants to his detriment; and, as a result, was proximately injured.

82.

Mickel, individually, and by and through her Affiliates, is liable to Plaintiff for actual and consequential damages in amounts to be proven at a trial or hearing on damages.

83.

Raymond's damages include, but are not limited to, approximately $400,000.00 or such amount as shall be determined at trial, his reasonable costs, reasonable expenses and reasonable attorneys' fees from Defendants, and Plaintiff is entitled to collect these damages from Defendants.

84.

Raymond is entitled to the remedies sought herein for damages, and all conditions precedent to Plaintiff' entitlement to the remedies he seeks have been satisfied or waived.

## COUNT IV

### *CONSTRUCTIVE FRAUD*

85.

Plaintiff Andrew Raymond realleges and herein incorporates by reference the allegations contained in paragraphs 1 through 84 above.

86.

In relevant part, O.C.G.A. § 23-2-51(b) provides that "[c]onstructive fraud consists of any act of omission or commission, contrary to legal or equitable duty, trust, or confidence justly reposed, which is contrary to good conscience and operates to the injury of another."

87.

Defendants have committed certain acts of omission or commission, which were contrary to legal or equitable duty, trust or confidence justly reposed, contrary to good conscience and injured Raymond.

88.

Raymond sustained loss and damage as the proximate result of Defendants' constructive fraud, including, without limitation, resulting in a loss of revenue to Raymond and Raymond's entitlement to money damages.

89.

Raymond is entitled to relief in the form of general damages in an amount to

27

be determined at trial.

90.

Raymond is entitled to relief in the form of attorneys' fees and expenses of litigation because Defendants engaged in constructive fraud.

91.

Raymond is entitled to relief in the form of punitive damages, in an amount to be determined at trial, because Defendants engaged in constructive fraud.

**COUNT V**

***TORTIOUS MISCONDUCT / NEGLIGENCE PER SE***

92.

Plaintiff Andrew Raymond realleges and herein incorporates by reference the allegations contained in paragraphs 1 through 91 above.

93.

Defendants owed a duty to Plaintiff not to engage in wire fraud in violation of 18 U.S.C. 1343 in a scheme to obtain money from Plaintiff by means of false or fraudulent pretenses, representations, or promises.

94.

Defendants breached the duty not to engage in wire fraud.

95.

Defendants owed a duty to Plaintiff not to engage in theft of money from

Plaintiff.

96.

Defendants breached the duty not to engage in theft.

97.

Defendants owed a duty to Plaintiff not to engage in fraud.

98.

Defendants breached the duty not to engage in fraud.

99.

Defendants breached the duty not to engage in the wrongful conduct set forth in this Complaint.

100.

The breaches by Defendants constitute negligence per se.

101.

The breaches by Defendants proximately caused Plaintiff to suffer damages, including special damages, as set forth in this Complaint.

102.

Plaintiff is entitled to recover damages from Defendants under O.C.G.A. §§ 51-1-1, 51-1-6 to 8, and all other authority.

103.

Plaintiff's damages include, but are not limited to, approximately $400,000.00

or such amount as shall be determined at trial, his reasonable costs, reasonable expenses and reasonable attorneys' fees from Defendants, and Plaintiff is entitled to collect these damages from Defendants.

104.

Plaintiff is entitled to the remedies sought herein for damages, and all conditions precedent to Plaintiff' entitlement to the remedies he seeks have been satisfied or waived.

## COUNT VI

## CIVIL CONSPIRACY

105.

Plaintiff Andrew Raymond realleges and herein incorporates by reference the allegations contained in paragraphs 1 through 104 above.

106.

"A conspiracy upon which a civil action for damages may be founded is a combination between two or more persons either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort. The gist of the action, if a cause of action exists, is not the conspiracy alleged, but the tort committed against the plaintiff and the resulting damage." *Cook v. Robinson*, 216 Ga. 328, 329, 116 SE2d 742 (1960).

107.

Reasonable people, including a jury, could conclude that Defendants engaged in a conspiracy, and that the sole purpose of the conspiracy was to defraud Raymond cheating Raymond out of money he was owed.

108.

The facts indicate that all Defendants acted in a conspiracy among themselves. They engaged in multiple predicate acts as part of the conspiracy.

109.

The acts associated with the aforementioned elements of the conspiracy were tortious in nature.

110.

Defendants inflicted great harm upon Plaintiff through their predicate acts.

111.

Plaintiff sustained loss and damage as the proximate result thereof, including, without limitation, Raymond's business failure and financial loss to Raymond.

112.

Plaintiff is entitled to relief in the form of general damages in an amount to be determined at trial.

113.

Plaintiff is entitled to relief in the form of attorneys' fees and expenses of

litigation as a result thereof.

114.

Plaintiff is entitled to relief in the form of punitive damages, in an amount to be determined at trial as a result thereof.

## COUNT VII

### *GEORGIA RICO*

115.

Plaintiff Andrew Raymond realleges and herein incorporates by reference the allegations contained in paragraphs 1 through 114 above.

116.

Defendants have intentionally violated the Georgia Racketeer Influenced and Corrupt Organizations) Act ("Georgia RICO") at O.C.G.A. § 16-14-1 et seq., by engaging in, conspiring to engage in, or endeavoring to engage in, a pattern of racketeering activity, by engaging in multiple instances of fraud, wire fraud, theft, and wrongdoing against Plaintiff as set forth herein, and upon information and belief engaging in similar instances of fraud, wire fraud, theft and wrongdoing with regard to other consumers, entitling Plaintiff to treble and punitive damages under O.C.G.A. § 16-14-6(c).

## COUNT VIII

### *FEDERAL RICO*

117.

Plaintiff Andrew Raymond realleges and herein incorporates by reference the allegations contained in paragraphs 1 through 116 above.

118.

Defendants have intentionally violated the Federal Racketeer Influenced and Corrupt Organizations Act ("Federal RICO") at 18 U.S.C. § 1961-1968 by engaging in, conspiring to engage in, or endeavoring to engage in, a pattern of racketeering activity, by engaging in multiple instances of fraud, wire fraud, theft and wrongdoing against Plaintiff as set forth herein, and upon information and belief engaging in similar instances of fraud, wire fraud, theft and wrongdoing with regard to other potential damages, entitling Plaintiff to treble damages and the cost of the suit, including a reasonable attorney's fee, under 18 U.S.C. § 1964.

119.

Federal RICO explicitly provides a cause of action for any person injured in his business or property by reason of a violation of the federal RICO statute. 18 U.S.C.S. § 1964(c).

120.

The U.S. Supreme Court "has made it clear that federal RICO applies 'not

just [to] mobsters' but to 'any person' who violates its provisions. The statute, moreover, is intended 'to be read broadly,' in accordance with "Congress' self-consciously expansive language and overall approach,' as 'an aggressive initiative to supplement old remedies and develop new methods for fighting crime,' regardless of whether the defendant is associated with organized crime or a 'respected business.'" Chevron Corp. v. Donziger, 974 F. Supp. 2d 362, 526-27 (S.D.N.Y. 2014) *citing* Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497-99 (1985.

121.

To prove a violation of 18 U.S.C. § 1962(c), a Raymond must establish: (i) the existence of an enterprise which affects Mickel or foreign commerce; (ii) that the defendant associated with the enterprise; (iii) that the defendant participated in or conducted the enterprise's affairs; and (iv) that the participation in or conduct of the enterprise's affairs was through a pattern of racketeering activities. United States v. Goldin Indus., Inc., 219 F.3d 1271, 1274 (11th Cir. 2000) (*citing* United States v. Weinstein, 762 F.2d 1522, 1536 (11th Cir. 1985)).

122.

18 U.S.C. § 1961(4) defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

123.

At all relevant times, the enterprises alleged in paragraphs 124 through 138 infra were engaged in, and their activities affected, interstate commerce.

**A. The Individual Enterprise**

124.

An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 946, 129 S. Ct. 2237, 173 L. Ed. 2d 1265 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981)).

125.

Although it need not have an "'ascertainable structure' distinct from the associations necessary to conduct the pattern of racketeering activity," *Goldin Indus.*, 219 F.3d at 1275, an association-in-fact nevertheless "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946.

126.

"[T]he definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes, that is,

the pattern of racketeering activity requisite to the RICO violation." *Goldin Indus.*,

219 F.3d at 1275 (<u>citing</u> *United States v. Elliott*, 571 F.2d 880, 898 (5th Cir. 1978)).

127.

UT&M and Shonda M. Mickel constitute an "enterprise," within the meaning

of 18 U.S.C. §§ 1961(4) and 1962(c), in that they are "a group of individuals

associated in fact" (hereinafter referred to as the "Individual Enterprise").

128.

UT&M and Shonda M. Mickel share the common purpose of, among other

things, fraudulently and deceptively inducing Raymond to enter into the Settlement

Agreement predicated on the Side Deal and agree to the Side Deal.

129.

UT&M and Shonda M. Mickel are related in that they cooperatively market

and sell UT&M Taxes & More Franchises.

130.

The Individual Enterprise possesses sufficient longevity for its members to

carry out their purposes in that the Individual Enterprise has operated, at a

minimum, since 2013, continues to operate, and continues to fraudulently induce

potential franchises to purchase the franchises and fails to comply with the FTC

Disclosure Rule.

131.

UT&M and Shonda M. Mickel are each a "person," within the meaning of 18 U.SC. §§ 1961(3) and 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of the Individual Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

132.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 59 through 68.

## B. Corporate Enterprise (Alternatively)

133.

In the alternative to ¶¶ 124 through 132 *supra*, UT&M Franchising, UT&M Corp, UT&M Licensing, and UT&M Training, as legal entities, constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (hereinafter referred to as the "Corporate Enterprise").

134.

The Corporate Enterprise shares the common purpose of, among other things, fraudulently and deceptively inducing Raymond to enter into the Settlement Agreement predicated on the Side Deal and agree to the Side Deal.

135.

The members of the Corporate Enterprise are related in that they share common ownership.

136.

The Corporate Enterprise possesses sufficient longevity for its members to carry out their purposes in that the Individual Enterprise has operated, at a minimum, since 2013, continues to operate, and continues to fraudulently induce potential franchisees to purchase franchises and fail to comply with the FTC Disclosure Rule.

137.

The members of the Corporate Enterprise are each a "person," within the meaning of 18 U.SC. §§ 1961(3) and 1962(c), that individually conducted, participated in, engaged in, and operated and managed the affairs of Corporate Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

138.

Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud described in ¶¶ 59 through 68.

## COUNT IX

### *CONVERSION*

139.

Plaintiff Andrew Raymond realleges and herein incorporates by reference the allegations contained in paragraphs 1 through 138 above.

140.

As more specifically described above, Defendants converted includes, but is not limited to tax preparation fees in the amount of approximately $400,000.00 or such amount as shall be determined at trial to the detriment of Plaintiff, and equity requires Defendants to compensate Plaintiff for this theft by returning the tax preparation fees due to Plaintiff.

141.

Plaintiff is entitled to recover monetary and other appropriate damages from Defendants, resulting from the conversion by Defendants.

142.

Plaintiff is entitled to the remedies sought herein for damages, and all conditions precedent to Plaintiff' entitlement to the remedies he seeks have been satisfied or waived.

## COUNT X

### *UNJUST ENRICHMENT*

143.

Plaintiff Andrew Raymond realleges and herein incorporates by reference the allegations contained in paragraphs 1 through 142 above.

144.

As more specifically described above, Defendants were unjustly enriched to the detriment of Plaintiff, and equity requires Defendants to compensate Plaintiff for this benefit.

145.

Plaintiff is entitled to recover monetary and other appropriate damages from Defendants, resulting from the unjust enrichment of Defendants.

146.

The amount by which Defendants have been unjustly enriched includes, but is not limited to, tax preparation fees in the amount of approximately $400,000.00 or such amount as shall be determined at trial, and Plaintiff is entitled to collect the tax preparation fees from Defendants.

147.

Plaintiff is entitled to the remedies sought herein for damages, and all conditions precedent to Plaintiff' entitlement to the remedies he seeks have been

satisfied or waived.

## COUNT XI

### *PIERCE CORPORATE VEIL / AID & ABET BREACH OF DUTY*

148.

Plaintiff Andrew Raymond realleges and herein incorporates by reference the allegations contained in paragraphs 1 through 147 above.

149.

Upon information and belief, are sham or "shell" entities, solely organized and operated as the mere alter-ego or instrumentality of Mickel for her own personal benefit and financial gain and used to perpetuate fraud on Raymond and others.

150.

Specifically, upon information and belief, Mickel used UT&M as an artifice of her fraudulent scheme to induce Raymond to enter into the Settlement Agreement and the Side Deal. Mickel knowingly and intentionally falsely represented both her disclosure and financial obligations to Raymond and commingled personal and business funds for her own personal benefit.

151.

Upon information and belief, Mickel has disregarded the basic corporate and limited liability company formalities in connection with both the Settlement Agreement and Side Deal. This disregard includes but is not limited to the

commingling funds and assets, undercapitalization, and otherwise operating UT&M in such a way that the company no longer has its own corporate personality that is separate and distinct from Shonda M. Mickel.

152.

Based on the above, Mickel used UT&M to perpetuate a fraud upon Raymond and, therefore, is individually liable to Raymond for the conduct described herein.

153.

Through improper and wrongful conduct in connection with both the Settlement Agreement and the Side Agreement, and without privilege, and with knowledge that UT&M owed Raymond duties, Mickel acted purposely and with malice and the intent to injure Raymond.

154.

The wrongful conduct of Mickel procured a breach of UT&M's duties to Raymond, which proximately caused damage to Raymond.

155.

Mickel is jointly liable with her Affiliates for the injuries to Raymond, and Raymond is entitled to damages from Mickel.

## COUNT XIII

### *CONSTRUCTIVE TRUST*

156.

Plaintiff Andrew Raymond realleges and herein incorporates by reference the allegations contained in paragraphs 1 through 155 above.

157.

"A constructive trust is an involuntary equitable trust created as a remedy to compel the transfer of property from the person wrongfully holding it to the rightful owner." *Platypus Wear, Inc. v. Horizonte Fabricacao Distribuicao Importacao E Exportacao Ltda*, No. 08-cv-20738-KMM, 2015 U.S. Dist. LEXIS 184368 (S.D. Fla. Mar. 2, 2015) (citing *In re Real Estate Associates Ltd. Partnership Litig.*, 223 F. Supp. 2d 1109, 1139 (C.D. Cal. 2002)), affirmed *Platypus Wear, Inc. v. Horizonte LTDA*, 693 Fed. Appx. 843, 2017 U.S. App. LEXIS 12337 (11th Cir. Fla., July 11, 2017).

158.

A constructive trust "is a trust implied whenever the circumstances are such that the person holding legal title to property, either from fraud or otherwise, cannot enjoy the beneficial interest in the property without violating some established

principle of equity." O.C.G.A. § 53-12-132.

159.

"Equity will not allow one with a legal interest in a piece of property a windfall recovery when the beneficial interest should flow to another." *Weekes v. Gay*, 243 Ga. 784, 787 (3) (256 SE2d 901) (1979). A "constructive trust is a remedy created by a court in equity to prevent unjust enrichment." *St. Paul Mercury Ins. Co. v. Meeks*, 270 Ga. 136, 138 (2) (508 SE2d 646) (1998).

160.

"The imposition of a constructive trust requires: (1) the existence of res (property or some interest in property); (2) the right of the complaining party to that res; and (3) some wrongful acquisition or detention of the res by another party who is not entitled to it." *See Burlesci v. Petersen*, 68 Cal. App. 4th 1062, 1069 (1998).

161.

UT&M structured its franchise relationship with Raymond to assure that UT&M had complete and utter control over any and all funds deposited in the Franchisee's bank account. These funds comprised not only UT&M's Royalty and Transaction Fees, but approximately $400,000.00 in fees belonging exclusively to Raymond.

162.

"A fiduciary duty extends between parties when there is confidence reposed

on one side and the resulting superiority and influence on the other.

163.

The extent of UT&M's control over the revenues of the Franchisee imposed duties of care, confidentiality, loyalty, obedience, and accounting upon UT&M.

164.

UT&M has breached its fiduciary duties to Raymond and defrauded Raymond by fraudulently inducing Raymond to enter into the Settlement Agreement, engaging in a continuing fraud after execution of the Settlement Agreement, and breaching the Side Deal.

165.

As a consequence of the fraudulent, wrongful, unlawful, and inequitable conduct of UT&M, as alleged above, UT&M has obtained property interests and profits therefrom which in justice and equity belong to Raymond. These interests and profits include, but are not limited to, approximately $400,000.00 in fees wrongfully withheld from Raymond, and all sums derived from the investment of such profits and any assets purchased therewith, together with an amount equal to the remaining present value of the said property.

166.

The property UT&M has withheld from Raymond is, on information and belief, in imminent danger of dissipation.

167.

A constructive trust arises as a matter of law when the facts giving rise to the fraud occur.

168.

The facts giving rise to UT&M's fraud demands the imposition of a constructive trust to protect Raymond's property by removing that property from UT&M's control and ordering UT&M to immediately deposit not less than $400,000 in the registry of this Court.

## COUNT XIV

### *EQUITABLE LIEN*

165.

Plaintiff Andrew Raymond realleges and herein incorporates by reference the allegations contained in paragraphs 1 through 164 above.

169.

O.C.G.A. § 23-2-90(a) defines "equitable assets" as those assets which "may be reached only through the intervention of equity.". 843, 2017 U.S. App. LEXIS 12337 (11th Cir. Fla., July 11, 2017).

170.

The imposition of an equitable lien requires the right of the complaining party to those assets; and the wrongful acquisition or detention of those assets by another

party who is not entitled them.

171.

UT&M structured its franchise relationship with Raymond to assure that UT&M had complete and utter control over those funds deposited in the Franchisee's bank account, which included, not only UT&M's Royalty and Transaction Fees, but also approximately $400,000.00 in fees belonging exclusively to Raymond.

172.

As a consequence of the fraudulent, wrongful, unlawful, and inequitable conduct of UT&M, as alleged above, UT&M has obtained property interests and profits therefrom which in justice and equity belong to Raymond. These interests and profits include, but are not limited to, approximately $400,000.00 in fees wrongfully withheld from Raymond, and all sums derived from the investment of such profits and any assets purchased therewith, together with an amount equal to the remaining present value of the said property.

173.

The property UT&M has withheld from Raymond is, on information and belief, in imminent danger of dissipation.

174.

The facts giving rise to UT&M's fraud demands the imposition of an equitable

lien to protect Raymond's property by removing that property from UT&M's control and ordering UT&M to immediately deposit not less than $400,000 in the registry of this Court.

## COUNT XV

### *ACCOUNTING*

### 175.

Plaintiff Andrew Raymond realleges and herein incorporates by reference the allegations contained in paragraphs 1 through 174 above.

### 176.

An equitable accounting is granted when an accounting at law is inadequate. *Herring v. Standard Guar. Ins. Co.,* 238 Ga. 261, 232 S.E.2d 544 (1977).

### 177.

The relationship between Defendants and Raymond is so sufficiently completed and without an adequate remedy at law at to require an equitable accounting.

### 178.

Defendants have acted in bad faith, have been stubbornly litigious, and have caused Raymond unnecessary trouble and expense so as to necessitate an

accounting.

## COUNT XVI

### *ATTORNEYS' FEES & EXPENSES OF LITIGATION*

179.

Plaintiff Andrew Raymond realleges and herein incorporates by reference the allegations contained in paragraphs 1 through 178 above.

180.

Defendants have acted in bad faith, have been stubbornly litigious, and have caused Raymond unnecessary trouble and expense so as to warrant an award of the expenses of litigation, including reasonable attorney's fees, pursuant to O.C.G.A. § 13-6-11.

## COUNT XVII

### *PUNITIVE DAMAGES*

181.

Plaintiff hereby realleges and reincorporates every paragraph, allegation, and count of this Complaint as if fully set forth herein.

182.

The conduct of Defendants constitutes such willful misconduct, malice, wantonness, oppression, and that entire want of care so as to raise a presumption of a conscious indifference to the consequences of her actions, entitling Raymond to

an award of punitive damages.

WHEREFORE, Plaintiff prays as follows:

1. Process issue and Defendant be served as provided by law.

2. Plaintiff has a trial by jury.

3. Plaintiff be awarded all general, special, compensatory, incidental, consequential, and all other permissible damages in accordance with the enlightened conscience of a fair and impartial jury.

4. Plaintiff be awarded interest and costs.

5. Plaintiff be awarded attorney's fees and costs of litigation in an amount which will be proven through the evidence at the time of trial (O.C.G.A. § 13-6-11).

6. Plaintiff be awarded such other and further relief as this Court deems just and proper and permitted under Georgia law.

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY.

Dated: May 31, 2022

/s/ Robert Arkin
Robert Arkin, Esq.
Georgia Bar No. 021575

Counsel for Plaintiff Andrew W. Raymond

ROBERT ARKIN LLC d/b/a Arkin Law
50 Hurt Plaza SE, Suite 1444
Atlanta, GA  30303-2946
(T) 404-220-8500
(F) 855-804-9334
Email: robert@arkin.law

## VERIFICATION

I, Andrew W. Raymond, declare as follows:

1.      I am a resident of Texas and submit myself to the jurisdiction of the U.S. District Court for the Northern District of Georgia, Atlanta Division.

2.      If called upon to testify, I would testify competently as to the matters set forth in the foregoing Verified Complaint for Damages and Equitable Relief.

3.      I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Verified Complaint and Equitable Relief concerning me and my past and intended activities are true and correct to the best of my knowledge and understanding.  28 U.S.C. § 1746.

Executed on May 31, 2022.

Andrew W. Raymond

Subscribed and sworn before me on this the 31st day of May, 2022.

NOTARY PUBLIC
My Commission expires: 09/08/2025

PAUL BERBER, JR.
My Notary ID # 131270140
Expires September 8, 2025

## VERIFICATION

I, Andrew W. Raymond, declare as follows:

1.     I am a resident of Texas and submit myself to the jurisdiction of the U.S. District Court for the Northern District of Georgia, Atlanta Division.

2.     If called upon to testify, I would testify competently as to the matters set forth in the foregoing Verified Complaint for Damages and Equitable Relief.

3.     I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Verified Complaint and Equitable Relief concerning me and my past and intended activities are true and correct to the best of my knowledge and understanding.  28 U.S.C. § 1746.

Executed on May 31, 2022.

Andrew W. Raymond

Subscribed and sworn before me on
this the 31st day of May, 2022.

NOTARY PUBLIC
My Commission expires: 09/08/2025

PAUL BERBER, JR.
My Notary ID # 131270140
Expires September 8, 2025